1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    BRUCE ARMSTRONG,                    Case No.   1:15-cv-01109-DAD-JDP

12              Petitioner,               FINDINGS AND RECOMMENDATIONS
                                          TO DENY AMENDED PETITION FOR A
13        v.                              WRIT OF HABEAS CORPUS

14    DEBBIE ASUNCION,                    OBJECTIONS DUE WITHIN FOURTEEN
                                          DAYS
15              Respondent.
                                          ECF No. 17
16
                                          ORDER DENYING MOTION FOR
17                                        EVIDENTIARY HEARING

18                                        ECF No. 30

19

20          Petitioner Bruce Armstrong, a state prisoner with counsel, seeks a writ of habeas corpus

21    under 28 U.S.C. § 2254.  ECF No. 17.  Petitioner claims constitutional violations arising from

22    ineffective assistance of counsel, prosecutorial misconduct, juror bias, wrongful denial of an

23    evidentiary hearing, improper exclusion of credibility testimony, and cumulative error.  *Id*.

24    Respondent argues that the state trial court's actions were reasonable and did not conflict with

25    Supreme Court precedent.  ECF No. 26.  We recommend that the court deny the petition.

26    **I.    Background**

27          Petitioner challenges his conviction and sentence, which arose from two incidents of

28    domestic violence against his wife, Sunshine Armstrong.  Petitioner was charged with 12 counts

of California penal code violations on May 26, 2010, including attempted murder, inflicting

corporeal injury on a spouse, burglary, and assault.[1]  ECF No. 17 at 10-11.

On April 15, 2011, the jury found petitioner guilty of inflicting corporeal injury on a

spouse, causing a child under his care to be inflicted with unjustifiable pain and mental suffering,

and commercial burglary.[2]  *Id.* at 12.  The jury also found him guilty of lesser-included offenses

under separate counts: causing a child under his care to be inflicted with unjustifiable pain and

mental suffering, assault with force likely to produce great bodily injury, and inflicting corporeal

injury on a spouse.  *Id.*[3]  The court sentenced petitioner to 29 years and four months incarceration.

Petitioner argued on direct appeal that the prosecutor had committed numerous acts of

misconduct.  *People v. Armstrong*, No. F064006, 2014 Cal. App. Unpub. LEXIS 192, at *1 (Cal.

Ct. App. Jan. 13, 2014).  The Court of Appeal found one instance of prosecutorial misconduct but

concluded that petitioner was not prejudiced by it.  *Id.*  Petitioner sought review at the California

Supreme Court and was denied relief.  ECF No. 17 at 13.  He then filed a habeas corpus petition

in Madera County Superior Court and upon denial unsuccessfully petitioned the California Court

---

[1] Petitioner's criminal counts included: "count 1 . . . attempted murder of 'Jane Doe'; count 2 . . . inflicting corporeal injury on a spouse, 'Jane Doe'; count 3 . . . residential burglary; count 4 . . . causing a child under his care, 'Minor Doe #1,' to be inflicted with unjustifiable pain and mental suffering under circumstances likely to produce great bodily harm and death; count 5 . . . causing a child under his care, 'Minor Doe #2,' to be inflicted with unjustifiable pain and mental suffering under circumstances likely to produce great bodily harm and death; count 6 . . . assault on 'Jane Doe,' with force likely to produce great bodily injury; count 7 . . . inflicting corporeal injury on a spouse, 'Jane Doe'; count 8 . . . criminal threats on 'Jane Doe'; count 9 . . . using express or implied threat of force or violence to dissuade a witness or victim, 'Jane Doe'; count 10 . . . commercial burglary; count 11 . . . criminal threats on 'Jane Doe'; and count 12, stalking 'Jane Doe.'"  ECF No. 17 at 10-11.

[2] The jury could not reach a verdict on the attempted murder charge and found petitioner not guilty of burglary and intimidation of a witness by force.  The trial court acquitted petitioner of criminal threats and stalking on petitioner's post-judgment motion for acquittal.  *See Armstrong*, No. F064006, 2014 Cal. App. Unpub. LEXIS 192, at *1, 3, 7.

[3] In summary, the trial court granted petitioner's motion for dismissal of counts 11 and 12 and the jury deadlocked on count 1; found petitioner guilty of counts 2, 4, and 10; found petitioner not guilty of counts 3 and 9; and found petitioner guilty of lesser included offenses in counts 5, 6, and 7.  The jury also found that petitioner inflicted great bodily injury on the victim in count 2, that petitioner was released on bail when he committed the charged offenses, and that petitioner had committed a serious strike felony prior.  Finally, the jury did not find that petitioner had committed spousal abuse in the past seven years.  ECF No. 19 at 11-12.

of Appeal and the California Supreme Court for relief. *Id.*

The following facts are drawn from the opinion of the Court of Appeal of the State of California, Fifth Appellate District ("Court of Appeal"), and a presumption of correctness applies to them. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015). An independent review of the record warrants the adoption of these facts as a fair and accurate summary of the underlying offenses. *See Nasby v. McDaniel*, 853 F.3d 1049, 1054-55 (9th Cir. 2017).

> Incident of April 13, 2009
>
> Sunshine refused to testify at trial [as a prosecution witness] even after the trial court held her in contempt . . . . The court permitted the prosecution to enter into evidence Sunshine's testimony from the preliminary hearing.
>
> Sunshine testified at the preliminary hearing that Armstrong came to her place of employment at the North Fork Rancheria to speak with her on April 13, 2009. As Sunshine exited the security door to get into the lobby, Armstrong grabbed her by the neck and pushed her into the wall. Armstrong said he was going to kill her. Sunshine told Armstrong she could not breathe, and he eventually let go of her neck. She was afraid she would be killed, but agreed to go outside and talk with Armstrong if he would calm down. Sunshine attempted to get the attention of other employees, but Armstrong told her to stop trying to do so or he would kill her. Sunshine ran into her boss's office and hid in a closet. Sunshine did not see Armstrong again that day. She suffered bruising and scratches on her neck.
>
> Jody Jeffers was one of Sunshine's supervisors on April 13, 2009 . . . . Jeffers saw Sunshine and Armstrong talking together just outside the building on a deck. Jeffers went outside and asked if there was a problem . . . . He responded to a commotion in the front lobby to discover Armstrong had returned. Armstrong was upset and loud, so Jeffers asked him to leave. Instead, Armstrong jumped over the receptionist's counter and ran toward the office where Sunshine was working. The door was locked . . . [h]e broke open the door, so Jeffers jumped on him and grabbed his waist . . . . Jeffers was able to convince Armstrong to leave the building.
>
> Bennie Romiti, a Madera County Deputy Sheriff, was dispatched to the Rancheria on April 13, 2009. When Romiti spoke with Sunshine, she was crying, and appeared to be upset and afraid. Sunshine also had red marks and small scratches on her neck consistent with being choked.
>
> Despite her refusal to testify when ordered to do so by the trial court, Sunshine testified when called by the defense . . . . Sunshine admitted she engaged in an argument with Armstrong at her place

of employment, but denied that Armstrong touched her at any time that day. She admitted Armstrong broke into the office, but repeated that he did not touch her.

Incident of April 16, 2009

Sunshine testified at the preliminary hearing that she attended an ex parte hearing to obtain a restraining order against Armstrong the morning of April 16, 2009. When she arrived at the courthouse, she saw Armstrong parked in his vehicle. Armstrong did not go inside the courthouse and was gone when Sunshine left the courthouse. Later that day, Sunshine received a phone message from Armstrong asking that she contact him.

Sunshine was in the kitchen washing dishes when . . . she found Armstrong in the laundry room with something wood-colored in his hand. Sunshine turned to run away from him, but before she could get away she felt something hit the back of her head. Sunshine started screaming while Armstrong continued to hit her. She put her hands up in an attempt to protect herself. She was also kicking at Armstrong to fight him off. When Sunshine fell to the ground, Armstrong got on top of her and kept fighting with her. Sunshine eventually grabbed the metal part of the hammer and held onto it to protect herself.

Sunshine's daughter, T., came into the laundry room and yelled at Armstrong to stop hurting Sunshine. Armstrong was grabbing at Sunshine's face and his fingers went into her mouth and into her eyes. At one point Armstrong grabbed a pole and put it across Sunshine's neck . . . . Sunshine was eventually able to escape by jumping out a window and running to a neighbor's house . . . . She had a broken nose and lots of cuts and bruises on her head.

Police Officer Daniel D. Foss responded to the scene. When he arrived he saw three or four children on the street, one of whom had blood on her clothing. He located Sunshine, several houses away. She was on her back and covered in blood, especially her hair. He saw white matter on her skull he thought might be fragments from her skull. Sunshine told Foss that Armstrong hit her in the head with a hammer.

Foss located a hammer that had been found in a flower bed at the house where he located Sunshine. When he spoke with T., she had blood on her sweater and on her socks. One of the other children also had blood on his socks. Foss found blood on the walls and floor of the laundry room, along with a lot of blood smears, bloody footprints, and bloody hand prints. Pictures of the injuries suffered by Sunshine were entered into evidence.

Madera City Police Officer Shawn Bushey interviewed Armstrong on April 16, 2009. Armstrong stated he did not know where he was that afternoon, and appeared defensive. He had his hands crossed over his chest, and would look down when questions were asked. Bushey noted fresh scratches on the left side of Armstrong's face. Armstrong claimed he got the scratches from shaving. Bushey

opined the scratches were not consistent with shaving. Bushey also discovered two scratches on the left side of Armstrong's chest that appeared similar to the scratches on Armstrong's face. Armstrong also appeared nervous and scared.

Sunshine testified at trial that she instigated the incident by striking Armstrong with the hammer after he refused her attempt to reconcile.

Sunshine's Trial Testimony

Before she testified [as a defense witness], Sunshine's attorney, Michael McKneely, testified Foss informed him that if Sunshine testified for the defense, she would be arrested as she left the courtroom. McKneely informed Sunshine of this comment . . . . Sunshine also testified she had been informed that she would be arrested if she testified, but she wanted to do so anyway because she wanted to tell the truth.

With regard to the April 13, 2009, incident, Sunshine testified she had been arguing with Armstrong on the phone . . . . Sunshine went outside to speak with Armstrong when he came to her place of employment. An argument ensued, but no threats were made. Instead, Sunshine threatened Armstrong because she wanted him to leave. Armstrong did not touch her that day.

Sunshine explained the marks on her neck by stating she bruised easily, and she starts fidgeting when she is nervous. Her statements to the police were attempts to get even with Armstrong . . . . When an officer interviewed Sunshine, she stated she wanted to press charges because Armstrong had broken through the door. Sunshine was hopeful that doing so would also help her divorce case.

With regard to the April 16, 2009, incident, Sunshine admitted she was at home with the children. Sunshine had called Armstrong earlier that day and asked him to come over so she could apologize to him for everything, including the April 13 incident.

Sunshine knew Armstrong arrived because she heard him enter the house through the door in her bedroom that led outside . . . . Sunshine apologized, and told Armstrong she wanted to get back together. Armstrong told Sunshine he was done with the relationship.

Sunshine was upset. She found a hammer in the laundry room and confronted Armstrong when he exited the bathroom. Sunshine told Armstrong she wanted to continue their conversation, but Armstrong laughed at her and turned to leave. Sunshine then hit him with the hammer in the left shoulder. Armstrong turned and Sunshine hit him again in the chest causing him to fall backward. When Sunshine went to hit him again, Armstrong kicked her in the face breaking her nose. Sunshine fell backward, hit her head on a hard surface, and dropped the hammer. Sunshine reached for the hammer again. Armstrong got up, got on top of her, and grabbed at the hammer. Sunshine started kicking at Armstrong, swinging the

5

> hammer at him, and called for help. T. entered the laundry room to join the fray. Sunshine lost the hammer and escaped as soon as she could. She lied to the police so she would not get into trouble. Armstrong never hit her with the hammer.

*People v. Armstrong*, LEXIS 192, at *2-16.

Notably, T. testified for the prosecution in its case in chief. She testified that she was present during the attack and attempted to prevent petitioner from attacking Sunshine. *See* RT 9:2417-26. T. testified that she witnessed petitioner hit Sunshine at least ten times with a hammer, that she never witnessed Sunshine hit petitioner with a hammer, and that petitioner attacked her when she tried to prevent him from attacking Sunshine. *Id*.

## II. Discussion[4]

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003). To decide a § 2254 petition, a federal court examines the decision of the last state court to have issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The standard that governs our review of the state court's decision depends on whether the state court adjudicated petitioner's claims on the merits.

When a state court has adjudicated a petitioner's claims on the merits, a federal court reviews the state court's decision under the deferential standard of § 2254(d). Section 2254(d) precludes a federal court from granting habeas relief unless a state court's decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts. *See* 28 U.S.C. § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court

---

[4] All "RT" citations refer to the reporter's transcript. All "CT" citations refer to the clerk's transcript. Respondent has lodged these documents with this court. *See* ECF No. 41.

or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted). The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016). A federal habeas court has an obligation to consider arguments or theories that "could have supported a state court's decision." *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2557 (2018) (quoting *Richter*, 562 U.S. at 102). In addition, one rule applies to all state prisoners' petitions adjudicated on the merits: the petitioner must show that the state court's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Even when a state court does not explicitly address a petitioner's claims on the merits, a section 2254 petitioner still must satisfy a demanding standard to obtain habeas relief. When a state court gives no reason for denying a petitioner's habeas claim, a rebuttable presumption arises that the state court adjudicated the claim on the merits under section 2254(d), *see Richter*, 562 U.S. at 99, and we are obligated to consider arguments or theories that could support the state court's decision, *see Sexton*, 138 S. Ct. at 2557.

If a state court denies a petitioner's habeas claim solely on a procedural ground, then section 2254(d)'s deferential standard does not apply. *See Visciotti v. Martel*, 862 F.3d 749, 760 (9th Cir. 2016). However, if the state court's decision relies on a state procedural rule that is "firmly established and regularly followed," the petitioner has procedurally defaulted on his claim and cannot pursue habeas relief in federal court unless he shows that the federal court should excuse his procedural default. *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016); *accord Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016). If the petitioner has not pursued his habeas claim in state court at all, the claim is subject to dismissal for failure to exhaust state-court remedies. *See Murray v. Schriro*, 882 F.3d 778, 807 (9th Cir. 2018).

If obtaining habeas relief under section 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102. As the Supreme Court has put it, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id*. at 103 (citation omitted). Our habeas review authority serves as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id*. at 102-03 (emphasis added).

Here, petitioner raises seven habeas claims and various sub-claims. He claims that the state court unreasonably applied clearly established federal law and violated his right to a fair trial and due process when it denied his claims of: (1) juror bias; (2) ineffective assistance of counsel for failure to move for dismissal of juror no. 10[5] and for a mistrial; (3) ineffective assistance of counsel for failure to present expert medical testimony; (4) improper exclusion of credibility testimony; (5) prosecutorial misconduct for introduction of prejudicial testimony; (6) a pervasive pattern of prosecutorial misconduct; and (7) cumulative error. ECF No. 17.

### A. Standards of review

Petitioner's claims of improper exclusion of evidence, improper denial of his motion for mistrial, prosecutorial misconduct, and cumulative prejudice were rejected on the merits by the California Court of Appeal on direct review. ECF No. 17 at 12. The California Supreme Court denied review. *Id*. Because the appellate court rejected these claims on the merits, the deferential standard of § 2254 applies. *See* 28 U.S.C. § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018).

Petitioner's claims of ineffective assistance of counsel and juror bias were made in his petition for habeas corpus to the Madera County Superior Court. ECF No. 26 at 16. Madera County denied the petition after informal briefing. *Id*. at 28. Petitioner then filed a new habeas petition before the California Court of Appeal, which summarily denied the petition. Finally, the California Supreme Court denied that petition "on the merits with regard to petitioner's claims of

---

[5] In the record, the juror in question is exclusively referred to as "juror no. 10." *See* RT 15:4206. We use the same designation here.

ineffective assistance of counsel." *Id*. at 17. Because the California Supreme Court's denial of the ineffective assistance of counsel claim was on the merits, we apply the deferential standard of § 2254.

### B.     Juror bias

The California Supreme Court did not state its reasons for denying petitioner's juror bias claim. Therefore, we "look through" that decision to "the last related state-court decision that does provide a relevant rationale," which is the Madera County decision. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). We presume that the California Supreme Court adopted the same reasoning. *Id*.; *see Ylst v. Nunnemaker*, 501 U.S. 797 (1991) ("[W]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim [are presumed to] rest upon the same ground."). Madera County denied the July 2015 petition in part for procedural reasons: it was untimely and raised issues that should have been raised on direct appeal. Respondent argues that petitioner's instant federal claims are procedurally barred. ECF No. 26 at 28. We agree.

"[A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994). State rules are "adequate" if they are "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Id*. at 1010. State rules are "independent" if they are not "interwoven with federal law." *Coleman v. Thompson*, 501 U.S. 722, 735 (1991). Here, the Madera County Court declined to address petitioner's juror bias claims because he failed to meet state procedural requirements. *Walker v. Martin*, 562 U.S. 307, 316 (2011). For the reasons discussed below, these requirements rested on "adequate and independent state grounds." *Id*.

First, Madera County found the petition untimely. California's timeliness rule is clearly established and not interwoven with federal law. *See Walker v. Martin*, 562 U.S. 307, 317 (2011). California applies a "reasonableness standard" to judge whether a habeas petition is timely; a habeas petition must be filed without "substantial delay." *Id*. at 397. A "reasonable time" to file is generally less than 60 days. *See Evans v. Chavis*, 546 U.S. 189, 201 (2006). Here,

9

petitioner's state-level habeas petition was filed in July 2015, nearly four years after his December 2011 sentencing.

Second, in California, petitioners may not raise claims in habeas corpus petitions that were not raised on direct appeal. *In re Dixon*, 41 Cal. 2d 756, 759 (1953). Known as the "*Dixon* Bar," this rule is, according to the Supreme Court, both adequate and independent. *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016). Here, petitioner failed to raise his juror bias claims on direct appeal, instead raising them for the first time in his habeas petition.

Petitioner argues that a procedural bar should not apply here because there is "strong evidence" that the appellate court reached the merits of the juror bias claim. ECF No. 29 at 9-10. Petitioner cites the appeals court's order to the parties to brief the juror bias claim. *Id.*

After the parties briefed the juror bias claim, the appeals court summarily denied the petition. the California Supreme Court then denied the petition, providing no reasoning. It is possible that the reasoning of the state court here is nonexistent. *Ylst*, 111 S. Ct. at 2594 (recognizing that "sometimes the members of the court issuing an unexplained order will not themselves have agreed upon its rationale, so that the basis of the decision is not merely undiscoverable but nonexistent"). *Harrington v. Richter*, 562 U.S. 86, 100 (2011). Because the appellate court summarily denied the petition and the California Supreme Court denied the juror bias claim without explanation, we must follow *Wilson*'s instructions to "look through" to the last state court decision with relevant rationale—the Madera County decision. Madera County found the juror bias claim to be procedurally defaulted as untimely and unexhausted—both adequate and independent procedural grounds for denial. *See Wells*, 28 F.3d at 1008 ("[A] federal court may not review federal claims that were procedurally defaulted in state court."). Therefore, this court is procedurally barred from considering petitioner's juror bias claim. We note, however, that even if the juror bias claim were not procedurally barred, it would fail on the merits under § 2254(d)'s deferential standard.[6]

---

[6] Petitioner claims that the juror was either actually biased or impliedly biased. Actual bias "stems from a pre-set disposition not to decide an issue impartially," whereas implied bias exists "in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on

### C. Ineffective assistance of counsel (claims 2, 3)

Petitioner next claims that he received ineffective assistance from his trial counsel, Steven Geringer, because (1) he failed to move for dismissal of juror no. 10 or for a mistral, and (2) he failed to present expert medical testimony. The California State Supreme Court denied the ineffective assistance of counsel claims on the merits. Therefore, the deferential standard of AEDPA governs.

We apply the two-step inquiry from *Strickland v. Washington* to claims of ineffective assistance of counsel on habeas review. *See* 466 U.S. 668, 687 (1984). Under *Strickland*, a criminal defendant first must show some deficiency in performance by counsel that is "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id*. Second, the defendant must show that the deficient performance caused him prejudice, which requires "showing that counsel's errors were so serious as to deprive [the petitioner] of a fair trial." *Id*. Petitioner must show that a reasonable probability exists that the outcome of the trial would have been different, but for counsel's errors. *Harrington v. Richter*, 562 U.S. 86, 104 (2011). The relevant inquiry is whether the representation was incompetent, not whether it deviated from best practices. *Id*. at 105.

On habeas review, coupled with section 2254(d)'s fairminded jurist standard, the *Strickland* requirements become even more deferential: the question is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *See Richter*, 562 U.S. at 105. That is, if there is even one reasonable argument that counsel did not violate the *Strickland* standard—even if the state court has not identified that argument—the petitioner cannot obtain habeas relief. *See id*. at 106. The petitioner must show a substantial likelihood that the results of the trial would have been different, but for the ineffective assistance of counsel. *See id.*

---

the jury." *Fields v. Brown*, 503 F.3d 755, 766-67 (9th Cir. 2007) (en banc) (citing *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984)). Petitioner has not shown that either of these situations was present here.

### 1. Failure to move for dismissal of juror no. 10 or for a mistrial

During jury deliberations, an anonymous person called Geringer's office and stated that one of the jurors was acquainted with the parents of Sunshine, the victim. ECF No. 17 at 42. Geringer brought this to the attention of the trial judge within hours and conveyed that he believed the caller was talking about juror no. 10. RT 15:4204. The court inquired into the nature of juror no. 10's relationship with Sunshine's parents. *Id*. The trial court immediately ordered that juror no. 10 be brought to chambers, along with petitioner and both counsel. RT 15:2406. The judge questioned juror no. 10 and the juror stated that she knew Sunshine's mother from high school and that her husband was an acquaintance of Sunshine's father. RT 15:4204, 4207. However, juror no. 10 stated she had no contact with the mother and did not know the mother well enough to "have a cup of coffee with her or anything else." *Id*. at 4207. Finding that juror no. 10 was not prejudiced by her acquaintance to Sunshine's parents, the trial judge excused her to return to the other jurors. *Id.* at 4208. A few hours later, Geringer got another anonymous call from a person who stated that the juror acquainted with Sunshine's mom was named "Diana." *Id*. at 4212. Again, Geringer brought this to the trial judge's attention immediately. *Id*. The judge stated that no more interviews of jurors would be conducted without a more precise identification of the jurors in question. *Id*. at 4213.

Petitioner argues that Geringer was ineffective because he should have either moved for dismissal of juror no. 10 or for a mistrial. Under *Strickland*, attorneys may "make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. A decision not to investigate a possible trial issue "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. We find his decisions reasonable. The record reflects that Geringer took immediate and reasonable steps after receiving the anonymous phone calls to rectify the situation. At Geringer's urging, the judge held two in-chambers hearings about these phone calls, one of which included direct questioning of juror no. 10 for possible bias. The court found no evidence that the juror was improperly biased and concluded that it had insufficient information about "Diana" to take further steps. After these hearings, Geringer may have determined that further petitioning of the court on the issue would

be futile.  We find reasonable Geringer's decisions (1) to forgo moving to dismiss juror no. 10 and (2) not to seek a mistrial.

Moreover, to succeed on an ineffective assistance of counsel claim, petitioner must show prejudice, demonstrating that there is a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Bonin v. Calderon*, 59 F.3d 815, 833 (9th Cir. 1995).  In ineffective assistance of counsel claims related to juror bias, the petitioner must present some evidence that the juror in question was biased to demonstrate a reasonable probability of a different outcome.  *See Urban v. Nevada*, No. 3:11-cv-00427-HDM-VPC, 2012 U.S. Dist. LEXIS 47380, at *11 (D. Nev. Apr. 4, 2012) (finding that petitioner's ineffective assistance of counsel claim based on counsel's decision not to challenge a juror for cause failed; petitioner did not show juror bias and therefore could not demonstrate a reasonable probability of a different outcome).  Here, petitioner presented no evidence that juror no. 10 was, in fact, biased. The trial court's questioning of juror no. 10 tends to show that the juror was not biased. Therefore, petitioner's ineffective assistance of counsel claim fails.

### 2.        Failure to present expert medical testimony

Petitioner claims that Geringer's failure to present expert medical testimony rendered his assistance ineffective.  To succeed with this claim, petitioner must show that his counsel's failure was so serious as to violate the Sixth Amendment and that, but for the counsel's failure to call an expert, the result of the trial would have been different.  *See Harrington v. Richter*, 562 U.S. 86, 86 (2011).

In *Harrington*, defense counsel had not called an expert to testify about blood evidence during the petitioner's trial for murder.  *See* 562 U.S. at 96.  In his habeas petition, the petitioner claimed ineffective assistance of counsel based on failure to consult with a blood expert.  *Id*.  The Court found "that a reasonable attorney could decide to forgo inquiry into the blood evidence" because reasonable attorneys may differ in their trial strategies.  *Id*. at 106.  Counsel was "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."  *Id*. at 107.  "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."  *Id*. at

108. Attorneys are not expected to be "flawless" and they may not be "faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id*. at 110. The entire performance of the attorney must be considered; it is "difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Id*. at 111. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Id.* at 111.

However, if a petitioner can show that trial counsel failed to present favorable evidence, his ineffective assistance of counsel claim may be successful. In *Williams*, the habeas petitioner claimed ineffective assistance of counsel because his counsel failed to prepare adequately for the sentencing hearing and failed to introduce "voluminous" records favorable to the petitioner. *See Williams*, 529 U.S. 362, 367. The Court found ineffective assistance of counsel because there was a reasonable probability that the outcome would have been different had the jury heard the favorable evidence. *Id*. at 398.

Here, petitioner has shown neither that Geringer's behavior was so deficient as to violate the Sixth Amendment nor that the outcome would have been different had counsel called an expert. At trial, Officer Foss, a prosecution witness, was the sole witness to testify about the cause, timing, and severity of the victim's wounds. *See* RT 7:1828-1905. Foss concluded that the wounds were consistent with an assault with a hammer. *See id*. at 1830-31. Geringer did not call an expert witness to testify to the nature of the victim's injuries. Petitioner presents the declaration of Tara Godoy, a certified forensic nurse, in support of his contention that Officer Foss's testimony was misleading. *See* ECF No. 15-3 at 149-51. Godoy disagreed with some of Foss's opinions. *See id*. For example, Godoy disagreed with Foss's contention that broken noses do not bleed. *See id*. at 150. Godoy also stated that the injuries sustained by Sunshine could have been caused by objects other than a hammer. *See id*. However, Godoy stated that at least one of Sunshine's wounds, on her shoulder, could have been caused by a hammer. *See id.*

Petitioner argues that the types of wounds Sunshine endured were not those testified to by Foss. As in *Richter*, Geringer was free to make strategic decisions that were reasonable, and he

vigorously cross-examined Foss, poking holes in his conclusions.[7] RT 7:1862-1906. Unlike in *Williams*, Geringer did not withhold voluminous amounts of favorable documentary evidence; petitioner has not alleged that Geringer withheld any documentary evidence. *See Williams,* 529 U.S. at 367. Indeed, Geringer may have prevented *unfavorable* evidence from being presented to the jury by choosing not to call an expert witness; petitioner offers no reason to think otherwise. *See Bell v. Cone*, 535 U.S. 685 (2002) (holding that counsel made a reasonable strategic decision to waive closing argument because it prevented unfavorable evidence from being presented to the jury).

Petitioner also claims that Geringer's statement to the court in front of the jury—"I'm going to have to get a medical professional to come in"—improperly influenced the jury. RT 7:1915. Geringer stated that he wanted to call a medical professional for the purpose of "going into [Foss's] background and his ability to give his opinions." *Id*. "[I]n some cases—particularly cases where the promised witness was key to the defense theory of the case and where the witness's absence goes unexplained—a counsel's broken promise [to the jury] to produce the witness" may amount to prejudicial deficient performance. *See Saesee v. McDonald*, 725 F.3d 1045, 1049-50 (9th Cir. 2013). For this standard to be met, counsel must make an unequivocal promise to the jury to produce a certain witness or testimony. *Id*. at 1150 ("[I]t is essential that a promise be made."). However, counsel may choose to forego calling a promised witness in light of evidence presented by the opposing party. *See Coleman v. Sisto*, 591 F. App'x. 597, 598-99 (9th Cir. 2015).

Here, Geringer did not promise certain evidence or a witness to the jury. Rather, he asked the judge for a break to obtain an expert witness to undermine Foss's credibility. He may have then strategically changed tactics based on the prosecution's evidence. Moreover, petitioner has not shown, as required, that Geringer's statement to the court and subsequent failure to call an

---

[7] Geringer's cross-examination revealed that Sunshine spent only one day in the hospital, that Foss had no personal knowledge of the events leading to Sunshine's injury, and that Foss was only 60% sure that the hammer found near the crime scene was the crime weapon. *See* RT 7:1862-77.

expert witness changed the outcome of his case. *See Wong v. Belmontes*, 558 U.S. 15, 27-28 (2009). We find no ineffective assistance of counsel here.

### D. Trial court's exclusion of credibility testimony

Petitioner argues that the trial court unconstitutionally prevented Sunshine from presenting evidence of the state seizure of her children and the accompanying state threat of the permanent removal of her children if she testified in support of the defense. ECF No. 17 at 32. The last reasoned decision on this claim comes from the Court of Appeal, which found that the trial court did not err in excluding the evidence on relevance and efficiency grounds. *See People v. Armstrong,* No. F064006, 2014 Cal. App. Unpub., LEXIS 192 (Cal. App. Jan. 13, 2014). Under California evidence rules, a trial court in its discretion may exclude "evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Cal. Evid. Code § 352; *cf.* Fed. R. Evid. 403 (correlating with the California rule).

Petitioner argues that exclusion of the evidence prevented him from presenting a complete defense. ECF No. 17 at 50. "The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). However, "'state and federal rule makers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). Only rarely has the Supreme Court "held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013). Courts are permitted to "focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." *Holmes*, 547 U.S. at 330. We "must consider the value of the evidence [excluded] in relation to the purposes purportedly served by its exclusion to determine whether a constitutional violation has occurred." *Jackson v. Nevada*, 688 F.3d 1091, 1097 (9th Cir. 2012).

The petitioner must show that the excluded testimony "would have been relevant and material, and that it was vital to the defense." *Washington v. Texas*, 388 U.S. 14, 16 (1967).

Here, the trial judge requested an offer of proof, outside the jury's presence, from Geringer regarding his contention that the state had threatened Sunshine with the removal of her children if she testified in support of petitioner. *See* RT 9:2527. The prosecutor stated that the children were removed because Sunshine and the children were living with petitioner. *See id.* at 2530-31. Geringer argued that this testimony should be allowed because it demonstrated that the state's actions were an attempt to intimidate Sunshine and prevent her from serving as a defense witness. *See id.* at 2528. The trial court found that any relevance of this testimony was outweighed by the risk of diverting "the jury's attention to collateral matters" and deemed it inadmissible. *Id.* at 2531-32.

Petitioner cannot show that the value of Sunshine's testimony of the seizure and threats outweighed the risk of distracting the jury. Sunshine refused to testify for the prosecution, even after being held in contempt of court. She ultimately served as a favorable defense witness, even testifying that she herself had assaulted petitioner. Petitioner does not argue that the excluded testimony would have revealed that Sunshine was biased against him, prejudicing his defense.[8] Petitioner did not show how the excluded testimony was logically related, much less *vital*, to the central issue of the case—his guilt or innocence.

Instead, petitioner argues that the introduction of the evidence would have served to bolster Sunshine's credibility. *See* ECF No. 17 at 52. Petitioner reasons that because Sunshine was under such a great threat from the state, her "testimony under such conditions would likely have given a strong impression to the jury [that] her trial testimony was truthful." *Id.* Petitioner's claim is unconvincing. By the time Sunshine testified for the defense at trial, the jury had already heard Sunshine's preliminary hearing testimony that she was violently attacked by the petitioner. Her trial testimony, which was contradicted by her preliminary hearing testimony, may have only

---

[8] Notably, Sunshine's testimony on this matter could have supported the prosecution's assertion that the petitioner was a violent person. If the children were removed because the petitioner was deemed a danger to them, it serves to reason that testimony about removal of the children would enhance the petitioner's reputation for danger in the eyes of the jury.

served to diminish her credibility before the jury. The fact that she testified while facing the seizure of her children could have marginally boosted her credibility before the jury, but there is no reason to expect that it would have changed the jury's view. We find reasonable the Court of Appeal's determination that the trial court did not err in excluding the evidence on relevance and efficiency grounds.

### E.     Prosecutorial misconduct (claims 5, 6)

Prosecutorial misconduct constitutes a due process violation when the misconduct denied the petitioner the right to a fair trial. *See United States v. Bagley*, 473 U.S. 667, 676 (1985). The appropriate standard of review for a prosecutorial misconduct claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power that [it] would possess in regard to [its] own trial court." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "Not every trial error or infirmity which might call for application of supervisory powers" by the trial court also correspondingly constitutes a denial of that "fundamental fairness essential to the very concept of justice." *Lisenba v. California*, 314 U.S. 219, 236 (1941). Here, petitioner must show that the misconduct "so infec[ted] the trial with unfairness as to make the resulting conviction a denial of due process." *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Even if the petitioner proves the prosecutorial misconduct was a due process violation, a habeas petition may only be granted "if that misconduct is deemed prejudicial under the 'harmless error' test articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)." *Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir. 2002). Here, petitioner has alleged various instances of prosecutorial misconduct.

### 1.     Introduction of hammer photograph

Petitioner argues that the prosecution committed misconduct when it gave the jury the impression that a picture of a hammer, introduced by the prosecution and accepted by the court as evidence, was the same hammer Sunshine testified was used in the crime. ECF No. 17 at 32. The last reasoned decision on this issue comes from the Court of Appeal.

At trial, the prosecution presented People's Exhibit No. 4, a picture of a hammer, to Officer Foss, and Foss proceeded to testify about the exhibit. RT 7:1846-47. In a conference

outside the presence of the jury, Geringer moved for a mistrial because the prosecution lacked knowledge of whether the hammer in Exhibit 4 was used in the crime. *Id*. at 1873. The judge denied the motion, stating that there was nothing in the record indicating the prosecutor intended to deceive the jury. *Id*. On redirect, the prosecution clarified with Foss that the photo was of a hammer found near the crime scene and that Foss did not know whether the hammer was used in the crime. *Id*. at 1891-93. Another officer, Bushey, later testified that he "was advised" that the hammer in the prosecution's photo exhibit belonged to a neighbor and was not the hammer used in the crime. RT 9:2491. In closing, the prosecutor stated that it was unclear if the hammer in the photo was the hammer used in the crime and that the jury should weigh it accordingly. RT 11:3115-16. At the close of trial, the judge rejected petitioner's motion for a new trial based on the hammer photo, stating that there was no evidence that the prosecutor intended to deceive the jury. RT 19:5419.

Petitioner claims that the prosecutor's conduct constitutes a *Napue* violation. *See Napue v. Illinois*, 360 U.S. 264 (1959). To prevail on a *Napue* claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony (or evidence) was actually false, and (3) that the false testimony (or evidence) was material." *Hein v. Sullivan*, 601 F.3d 897, 908 (9th Cir. 2010) (quoting *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)). False evidence is "material" when there is a "reasonable likelihood that the evidence could have affected the judgment of the jury." *United States v. Bagley*, 473 U.S. 667, 680 (1985); *see United States v. Agurs*, 427 U.S. 97, 104 (1976) (relevant inquiry is whether the false evidence could have affected the jury's judgment). *Napue* does not help petitioner here.

First, petitioner failed to show that the prosecutor introduced false testimony or evidence. Although the prosecution may have led the jury to believe that the hammer in the photo was the crime weapon, the prosecutor did not misstate the evidence. Instead, the prosecutor elicited testimony from Foss to show that the hammer was found near the scene of the crime. RT 7:1846. Because the jury heard Sunshine's preliminary hearing testimony that she was injured by a

hammer, the jury could have inferred that the prosecution was introducing a picture of the crime weapon, but the prosecution did not state this to the jury.

Second, because the petitioner failed to show that the testimony or evidence was false, he cannot meet the second prong of *Napue*—intent to deceive. The prosecutor stated to the judge that she believed the hammer in the photo was the crime weapon. RT 9:1873. Even if the petitioner could show that the hammer in the photo was not the crime weapon, the judge stated that the prosecutor did not intend to mislead the jury, *id*. at 1874.

Third, and most importantly, petitioner has not shown that the evidence was material— meaning that there was a "reasonable likelihood that the evidence could have affected the judgment of the jury," *Bagley*, 473 U.S. at 680, especially considering the prosecutor acknowledged uncertainty about the hammer during closing argument. Here, Sunshine testified to being attacked with a hammer at the preliminary hearing; this testimony was given to the jury. At trial, the prosecution presented a photo of a hammer found near the crime scene. In closing, the prosecutor told the jury it was unclear whether the hammer in the photo was the same as the crime weapon and instructed the jury to weigh that photo evidence accordingly. *See Greer v. Miller*, 483 U.S. 756, 766 (1987) (holding that petitioner's due process rights were not violated because of prosecutor's inappropriate question because it was followed by an objection and curative instructions); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) (denying a petition where prosecutor corrected misleading evidence). Considering the other evidence presented at trial, there is no indication that the photo of a hammer found near the crime scene had any meaningful impact on jurors. *See Darden v. State*, 329 So. 2d 287, 291 (1976) (If "overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges" exists, it reduces "the likelihood that the jury's decision was influenced" by the prosecutorial misconduct.).

Contrast the photo of the hammer with the evidence in *Miller v. Pate*, where the prosecutor presented a pair of shorts, covered in paint, and proclaimed that they were covered in the blood of the victim. *See Miller v. Pate*, 386 U.S. 1, 6-7 (1967). The shorts were found a mile away from the scene of the crime. *Id*. The Court stated that the prosecutor deliberately lied about

the shorts, that the prosecutorial misconduct caused the petitioner's conviction, and that the Fourteenth Amendment had therefore been violated. *Id.*

Finally, even if the introduction of the photo of the hammer were the result of prosecutorial misconduct, petitioner has not shown how he suffered any prejudice from the introduction of the photograph. Therefore, any error would be harmless. *See Brecht*, 507 U.S. at 637-38.

### 2. Pervasive pattern of prosecutorial misconduct

Next, petitioner claims that the prosecution engaged in a pervasive pattern of misconduct throughout the trial, violating petitioner's right to due process. We review the last reasoned decision on this claim, that of the Court of Appeal.

### a. Intimidation of defense witnesses

Petitioner claims that a person named Justin Day, at the direction of the prosecution, threatened Sunshine during the trial. ECF No. 17 at 65. Petitioner claims that Sunshine was threatened by Day with the state seizure of her children if she testified for the defense at trial. *Id.* Sunshine's children had been taken from her four days before she testified. *Id.* at 66. The Court of Appeal found that the seizure of the children was unrelated to the trial and that the prosecutor did not have knowledge of or influence over Day's action. *See People v. Armstrong*, No. F064006, 2014 Cal. App. Unpub., LEXIS 192, at *17 (Cal. App. Jan. 13, 2014). Sunshine ultimately testified as a defense witness. ECF No. 17 at 68.

Tampering with or intimidating a witness can amount to a due process violation. *See Webb v. Texas*, 409 U.S. 96 (1972) (judicial threatening of a witness was a due process violation because defendant was deprived of the right to present a defense). In *Webb*, the trial judge admonished a witness, *sua sponte*, stating that the witness could be jailed for lying on the stand. *Id.* at 95. The Court found that the defendant's Fourteenth Amendment due process rights had been violated because the witness could have felt pressured to stop testifying. *Id.*; *see Washington v. Texas*, 388 U.S. 14, 19 (1967) (holding that the right to present witnesses to establish a defense is a fundamental element of due process of law).

Here, petitioner makes a prosecutorial misconduct claim, alleging that Day was acting at the behest of the prosecution. Petitioner has not presented any evidence of a connection between Day and the prosecution. It is quite possible that Day was an agent of the local child protective services and had no communication with the local prosecuting office. Unlike the judge in *Webb*, whose position gave him great influence over the witness in question, there is no evidence that Day was a judicial actor or other court officer. Critically, petitioner was not prevented from presenting Sunshine as a witness; she ultimately testified as a defense witness. Petitioner does not argue that Sunshine's actual testimony was influenced by Day's actions; only that jurors may have found Sunshine's testimony more credible had they known about Day's alleged threats. *See* ECF No. 17 at 52. Even if petitioner could show that Day was acting under the direction of the prosecution, petitioner would also need to show that a due process violation occurred. Because petitioner had the opportunity to present his case through Sunshine's testimony, no due process violation or prosecutorial misconduct occurred.

### b.  Arguing facts not in evidence

Petitioner claims that the prosecution argued facts not in evidence when it argued that the injuries on Sunshine's body were consistent with injuries from a hammer. RT 11:3120; 30-31. Prosecutors have a special obligation to avoid "improper suggestions, insinuations, and especially assertions of personal knowledge." *Berger v. United States*, 295 U.S. 78, 88 (1935). Prosecutors may not argue facts not in evidence. *See United States v. Semikian*, 307 F. App'x. 107, 109 (9th Cir. 2009). However, "there is no case law supporting the proposition that a prosecutor may not comment on facts in evidence and plainly obvious to the jury." *Id*.

Petitioner argues that there were no facts presented during trial that supported an assertion that the crime weapon was a hammer. ECF No. 17 at 69. Petitioner is mistaken. Petitioner's daughter, T., testified that she witnessed petitioner hit Sunshine multiple times with a hammer. RT 9:2419. Sunshine testifies that she hit petitioner with a hammer and that petitioner grabbed the hammer out of her hands. RT 9:2564-69. Foss testified that Sunshine told him she was attacked by petitioner with a hammer and that he found a hammer near the crime scene. RT 7:1836. The paramedic who responded to the scene testified that Sunshine told him that she was

attacked with a hammer by petitioner.  RT 8:2182.  Even disregarding the hammer photo, the

verbal testimony elicited about the hammer alone was sufficient to lay a foundation for the

prosecution to argue that Sunshine's wounds appeared to be hammer wounds.  The jury was then

free to draw inferences from the evidence presented.  The prosecution's reference to the hammer

did not violate petitioner's due process rights.

### c.  Witness intimidation and arrest

Prior to the start of the trial, an attorney named Michael McKneely was appointed to

provide legal representation to Sunshine.  RT 9:25109.  Petitioner's attorney called McKneely as

a witness during trial for the purpose of testifying about an interaction he had with Officer Foss.

McKneely testified that Officer Foss told him that he would arrest Sunshine if she testified for the

defense.  RT 9:2510-11.  Sunshine also testified that both Foss and the prosecutor threatened her

with the same.  *Id*. at 2525.  Officer Bushey then arrested Sunshine for perjury after she testified

for the defense.  RT 9:2917.

"It is well established that 'substantial government interference with a defense witness's

free and unhampered choice to testify amounts to a violation of due process.'"  *Earp v. Ornoski*,

431 F.3d 1158, 1170 (9th Cir. 2005) (quoting *United States v. Vavages*, 151 F.3d 1185, 1188 (9th

Cir. 1998)).  Threatening a potential witness may provide cause to reverse a defendant's

conviction.  *See Webb v. Texas*, 409 U.S. 95, 98 (1972); *Williams v. Woodford*, 384 F.3d 567,

601-02 (9th Cir. 2004) ("Undue prosecutorial interference in a defense witness's decision to

testify arises when the prosecution intimidates or harasses the witness to discourage the witness

from testifying.").  However, "harmless error analysis is applicable to witness intimidation

claims."  *Brown v. Warden*, No. CIV S-09-0216 FCD GGH P, 2009 U.S. Dist. LEXIS 50051, at

*42 (E.D. Cal. June 15, 2009).  Therefore, petitioner must establish that the misconduct had a

"substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v.

Abrahamson*, 507 U.S. 619, 623 (1993); *see Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004).

As the appellate court noted, petitioner cannot show that prejudice arose from any

possible threats to Sunshine because "Sunshine testified, and she testified in a manner that was

very favorable to Armstrong."  *See People v. Armstrong*, No. F064006, 2014 Cal. App. Unpub.,

LEXIS 192, at *18 (Cal. App. Jan. 13, 2014). Petitioner has not established "what evidence would have been presented, or how that would have affected the outcome of his trial, in the absence of the alleged intimidation." *Buchanan v. Cate*, No. 10-0423 BTM (NLS), 2011 U.S. Dist. LEXIS 157379, at *118 (S.D. Cal. Sept. 30, 2011). In fact, petitioner does not argue that the substance of Sunshine's testimony would have been different absent the intimidation and arrest. Instead, petitioner argues that jurors may have been biased against Sunshine because she was arrested outside the courtroom while the jury was inside the courtroom, was on bail when she testified for the defense in surrebuttal, and likely had a poor demeanor during surrebuttal due to her arrest.[9] *See* ECF No. 17 at 68. However, on surrebuttal, Geringer directly questioned Sunshine about her arrest and Sunshine stated that she was arrested immediately after she testified for the defense in its case in chief and was then out on bail. *See* RT 10:2740. There is no evidence that the jury would have been aware of Sunshine's arrest absent the testimony elicited from Geringer on surrebuttal. Moreover, after her arrest Sunshine testified favorably for the defense on surrebuttal, again stating that she attacked petitioner, not that petitioner attacked her. *See id.* at 2745-46. Therefore, petitioner's claim has no merit.

### d. Examination of Officer Foss

Petitioner claims that the prosecutor asked questions outside the scope of the case and that Officer Foss gave non-responsive questions on the stand. ECF No. 17 at 70. Petitioner counts 17 objections made by Geringer during Foss' direct examination, 12 of which were sustained and 10 of which resulted in testimony being stricken from the record. *Id.* Petitioner did not argue that the trial judge ruled on the objections unfairly or that the jury was biased from hearing the stricken answers. Petitioner only made the bald assertion that the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012). We find no support for the contention that sustained objections

---

[9] Notably, petitioner earlier argued that evidence of the state's threats of arrest would have only served to bolster Sunshine's credibility. Here, petitioner argues that her eventual arrest placed Sunshine in a bad light before the jurors. Petitioner cannot have it both ways.

1    and stricken testimony alone equal a constitutional violation.  Because petitioner failed to

2    demonstrate a due process violation, we decline to grant relief.

3                       **e.      Vouching for government witnesses[10]**

4            During closing, the prosecution stated that the law enforcement witnesses were well-

5    trained and had "sworn to protect the laws, to protect people" and asked the jury, "[w]ho do we

6    believe here?"  RT 11:3122.  Petitioner claims that these statements were unconstitutional

7    because the statements constituted "improper vouching."  *See United States v. Wright*, 625 F.3d

8    583, 610 (9th Cir. 2010).  Because Geringer did not object to these statements during the closing,

9    we review petitioner's contention for plain error.  *See United States v. Gwaltney*, 790 F.2d 1378,

10   1386 (9th Cir. 1986).  Under the plain error doctrine, we recognize only "those errors that

11   'seriously affect the fairness, integrity or public reputation of judicial proceedings,'" and we will

12   grant relief "solely in those circumstances in which a miscarriage of justice would otherwise

13   result."  *United States v. Young*, 470 U.S. 1, 15 (1985) (citation omitted).

14           "The rule that a prosecutor may not express his . . . belief in the credibility of witnesses is

15   firmly established."  *United States v. McKoy*, 771 F.2d 1207, 1210-11 (9th Cir. 1985); *see United*

16   *States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) ("A prosecutor has no business telling the

17   jury his individual impressions of the evidence.").  "Improper vouching occurs when the

18   prosecutor places the prestige of the government behind the witness by providing personal

19   assurances of the witness's veracity."  *Id*.  However, rhetorical questions about a government

20   witness's motivation to lie are not improper where the prosecutor does not answer the rhetorical

21   questions and gives "no personal opinion about the truthfulness of the witness."  *Coreas v.*

22   *Allison*, No. CV 10-4354 JVS (MRW), 2012 U.S. Dist. LEXIS 42899, at *18-19 (C.D. Cal. 2012)

23   (holding that a prosecutor's rhetorical questions, "Do you think Detective Gill is going to say, I'm

24   going to make this up[?] I'm going to make up the fact [that Petitioner admitted ownership of a

---

[10] Petitioner also argued that the prosecution wrongfully referred to Officer Reyes' testimony
about a dismissed charge during closing.  ECF No. 17 at 72.  Geringer quickly objected to the
mention of Reyes and the trial court ordered the jury to disregard any testimony about Reyes in
the closing.  RT 11:3122.  We find no constitutional violation here because the prosecution's
mention of Reyes during closing was brief and the trial court quickly corrected the prosecution's
error.

gun?]" were not improper; prosecutor did not answer the questions or personally vouch for the witness's truthfulness). In contrast, blatant statements about a witness's credibility, such as "I think he was candid . . . I think he was honest," may be improper. *See Kerr*, 981 F.2d at 1053. Here, although it appears that the prosecutor signaled that testimony from law enforcement was more likely to be credible because of their training and oath of office, petitioner cannot show that the prosecutor's statements amounted to plain error. Unlike in *Kerr*, the prosecutor did not suggest that she herself found the officers credible. Plain error occurs when the "prosecutor's improper conduct so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict" and deprived the defendant of a fair trial. *See Smith*, 962 F.2d at 935; *Young*, 470 U.S. at 15. Petitioner has failed to show how the prosecutor's comment in closing deprived him of a fair trial.[11]

### f.     Presence of investigator at witness T. meeting

Petitioner claims that the prosecutor defied a trial court order to produce witness T. to the defense for interviewing. ECF No. 17 at 74. The trial court ordered that the court provide a probation officer and that a meeting be scheduled between T. and Geringer. RT 3:657. At that meeting, in the presence of the probation officer, Geringer was to be permitted to ask T. if she would like to be interviewed by the defense. *Id.* If T. refused, the court stated that that would "be the end of it and the probation officer will take T. back." *Id.* If T. consented to being interviewed, the probation officer would wait in another room, out of earshot. *Id.*

At the meeting, T. appeared along with the probation officer and a district attorney investigator, who insisted on being present for safety purposes. RT 4:905. T., who was not under subpoena, refused to speak to Geringer. *Id.* At a later hearing outside the presence of the jury, the court stated that the presence of the investigator was against the court's order. *Id.* at 906. However, petitioner did not move the court to schedule a new meeting and no further action was

---

[11] Moreover, attorneys are given "wide latitude in closing arguments," *United States v. Wilkes*, 662 F.3d 524, 538 (9th Cir. 2011), because they "are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear." *Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1974). Here, the rhetorical questions were asked during the prosecution's closing.

taken by petitioner to obtain an interview with T.  Therefore, the sole violation raised by

petitioner in the instant case is the presence of the district attorney investigator while Geringer

asked T. if she would consent to an interview.

    We find no support for the contention that the presence of the district attorney investigator

caused a constitutional violation.  The trial court had already ordered that a probation officer be

present when the initial question was asked of T.  Petitioner cannot show how the presence of the

additional person, the investigator, amounts to a constitutional violation.  Although the

prosecution may not intentionally interfere with a witness's choice to speak to Geringer, the

"defendant's right of access to a witness exists co-equally with the witness' right to refuse to say

anything." *See United States v. Black*, 767 F.2d 1334, 1338 (9th Cir. 1985).  The Court of Appeal

found no reason to believe that T. would have spoken to Geringer if the investigator had not been

present.  ECF No. 17 at 76.  Geringer admitted that even if the investigator had not been present,

"maybe nothing would have been accomplished anyway."  RT 4:905.  Instead, petitioner's sole

objection was that the state disobeyed the court's order that only the probation officer be present

for that initial question of T.  Petitioner has failed to show, and does not argue, that the presence

of the investigator caused T. to refuse to be interviewed.  T. was free to exercise her right to

refuse to speak to Geringer.

    Moreover, petitioner had the opportunity to object during T.'s testimony for the

prosecution and to cross-examine and re-cross examine T.  *See* RT 9:2426-67; 73-75.[12]  On cross,

petitioner had the opportunity to highlight any discrepancies in T.'s testimony and cast doubt on

her credibility.  During T.'s lengthy cross-examination, she admitted that she believed Sunshine

was mentally unstable and violent.  *Id*. at 2428.  Therefore, even though petitioner had no

opportunity to interview T. before her testimony, he had ample opportunity to cross-examine her

at trial, lessening any prejudice he may have experienced.

---

[12] T.'s testimony was particularly damaging for petitioner.  T. testified that she witnessed
petitioner hit Sunshine at least ten times with a hammer, that she never witnessed Sunshine hit
petitioner with a hammer, and that petitioner attacked her when she tried to prevent him from
attacking Sunshine.  *See* RT 9:2417-26.

### g. Courtroom misconduct

Petitioner claims Foss committed courtroom misconduct during testimony. Foss, in explaining the concept of self-defense, used various examples of behavior to explain self-defense, including a hypothetical involving the prosecutor. RT 7:1897-99. On cross-examination, Foss accused Geringer of "twisting it all up and changing it around," stating that the jury recognized "what's going on right now with this." *Id*. at 2502. Foss stated that it was unfortunate that the jury did not get a copy of the entire police report. *Id*. The trial court then told Foss to stop making comments to the jury. *Id*. at 2503. Petitioner also claims that Foss accused Geringer of fabricating evidence in front of the jury, *id*. at 2614, misled the jury when he spoke about the hammer found near the crime scene, RT 7:1902-03, and wrongfully complained to the judge and jury that Geringer made too many objections, RT 8:2210.

The relevant inquiry here is whether Foss's behavior so infected "the trial with unfairness as to make the resulting conviction a denial of due process." *Jones v. Dexter*, No. CV 08-408-CBM (PLA), 2012 U.S. Dist. LEXIS 188925, at *146 (C.D. Cal. Dec. 3, 2012) (finding no due process violation where witness mentioned petitioner's previous jail time before the jury because judge admonished the jury to disregard the comment); *see Tobey v. Uttecht*, No. C12-440-RAJ-JPD, 2013 U.S. Dist. LEXIS 116023, at *43 (W.D. WA Apr. 30, 2013) (finding no due process violation when witness revealed that petitioner invoked his right to remain silent because it was an isolated comment and the prosecutor did not use the comment to argue for petitioner's guilt). An error in the information presented to a jury is harmless, unless petitioner can show that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

Although Foss was a difficult witness to manage, petitioner has not shown how Foss's comments rendered the trial so unfair as to deny him due process. Geringer actively objected to Foss's behavior, the court sustained 12 of his 17 objections, and the court struck testimony from the record in 10 instances. ECF No. 17 at 70. The court admonished Foss to maintain professional behavior in front of the jury. RT 7:1875-76. These instances may have served to

discredit Foss in front of the jury, potentially undercutting his credibility. Petitioner cannot show that Foss's behavior substantially and injuriously influenced the jury's verdict.

### h.  Prosecutor's comments on social media

During the trial, the prosecutor posted the following comments to her Facebook page: (1) "After I spent the day trying to prevent my 13 year old star witness from being kidnapped, I found out I am getting the Prosecutor of the Year Award from the Victim Services Center. I almost cried when they called and told me," and (2) "Wooohoo! Defense's writ to the Fifth District Court of Appeal was DENIED!" C.T. 2:411. A day after the jury verdict, the prosecutor commented, "They hung on the attempted murder. They said that 'intent' was the issue for them." *Id.* Petitioner claims that these comments were prejudicial and amount to prosecutorial misconduct. *Id.* at 82.

Petitioner is entitled to relief if he shows that the misconduct occurred which "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Markers of a fair trial include a panel of impartial jurors and a verdict based on the evidence presented at trial alone. *See Irvin v. Dowd*, 366 U.S. 717, 718 (1961). Although the prosecutor's comments might have been unwise, there is no indication in the record that they were accessible to jurors, either directly or indirectly. *See* C.T. 2:411. Both the trial court and the Court of Appeal denied petitioner's request for a new trial based on these comments, finding no evidence that the jury was persuaded by, much less aware of, these comments. ECF No. 17 at 81-82. We see no basis for inferring that jurors read these comments. Therefore, petitioner has failed to show how the Facebook comments amount to prosecutorial misconduct.

### F.  Cumulative error[13]

Finally, petitioner claims that that the instances of prosecutorial misconduct, considered together, amount to unconstitutional prejudice against the petitioner and that the cumulative effect

---

[13] Petitioner made separate claims that the prosecution's instances of misconduct, when considered cumulatively, prejudiced petitioner's case and that the cumulative effect of multiple trial errors deprived petitioner of a fair trial. *See* ECF No. 17 at 82-84. Because we analyze both types of claims under the general standard of *Brecht*, we consider them together here.

of multiple errors during the trial violated his constitutional right to a fair trial.  *See Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000).

In the case of prosecutorial misconduct, "[e]ven when separately alleged incidents of prosecutorial misconduct do not independently rise to the level of reversible error, the cumulative effect of multiple errors can violate due process."  *See Wood v. Ryan*, 693 F.3d 1104, 1116-17 (9th Cir. 2012).  Cumulative error at trial applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still prejudiced a defendant."  *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).  However, we must determine "the relative harm caused by the errors."  *Id*. at 927-28.  "If the evidence of guilt is otherwise overwhelming" and "the errors are considered harmless," the conviction will generally be affirmed.  *Id*. at 928.  Errors that render the criminal defense "far less persuasive," *Chambers*, 410 U.S. at 294, are more likely to have a "substantial and injurious effect or influence" on the jury's verdict, *Brecht*, 507 U.S. at 637; *see Parle*, 505 F.3d at 934 (finding a cumulative error due process violation where all of trial court's errors were relevant to the only issue before jury, all improperly admitted evidence bolstered the state's case, and all erroneously excluded evidence rendered the defense less persuasive).

Here, none of the instances of alleged prosecutorial misconduct individually amount to a due process violation.  Similarly, when considered together, we cannot find that the errors, if any, rendered petitioner's defense far less persuasive.  Geringer addressed much of the alleged prosecutorial misconduct with the trial court directly, either through objections during examinations or through hearings outside the presence of the jury.  Many of the instances of alleged misconduct were never revealed to the jury, such as the social media postings and the alleged withholding of witness T.  The trial court openly admonished witness Foss in front the jury.  Petitioner has failed to show how any prosecutorial misconduct had a substantial or injurious effect on the verdict.

Moreover, we decline to find that any of petitioner's claims of cumulative trial error caused prejudice which warrants reversal.  There was ample evidence to convict petitioner at trial, including the testimony from Sunshine at the preliminary hearing that petitioner attacked her with

a hammer, testimony from T. at trial that she witnessed petitioner attacking Sunshine with a hammer, crime scene photos of a hammer with blood found near the crime scene, and testimony from law enforcement witnesses at the scene immediately after the incident. *See Parle*, 505 F.3d at 928. The state appellate court had basis to uphold Armstrong's conviction. This court declines to upset the state court rulings in this matter.

## II. Motion for Evidentiary Hearing

On May 23, 2017, petitioner moved this court for an evidentiary hearing. ECF No. 30. There is no right to an evidentiary hearing in habeas proceedings; only under limited circumstances are evidentiary hearings granted. *See* 28 U.S.C. § 2254(e)(2)(A)(ii). Under AEDPA, the court will not hold an evidentiary hearing unless the petitioner's claim relies on a new, retroactive rule of constitutional law that was unavailable to him or a fact that he could not have discovered through the exercise of due diligence. *Id.* Petitioner ignores this stringent standard for evidentiary hearings set by AEDPA and urges us to rely on a general rule regarding evidentiary hearings. *See* ECF No. 30 at 5; *Townsend v. Sain*, 372 U.S. 293, 313 (1963). Because petitioner neither relies on a new retroactive constitutional law nor on a fact that he could not have discovered previously, he fails to meet AEDPA's requirements. Therefore, we deny his motion for an evidentiary hearing.

## III. Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord*

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Here, petitioner has not made a substantial showing of the denial of a constitutional right.  Thus, we recommend that the court decline to issue a certificate of appealability.

**IV.    Order**

Petitioner's motion for an evidentiary hearing is denied.  ECF No. 30.

**V.    Findings and Recommendations**

The court should deny the amended petition for a writ of habeas corpus, ECF No. 17, and decline to issue a certificate of appealability.  These findings and recommendations are submitted to the U.S. District Court judge presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 14 days of the service of the findings and recommendations, petitioner may file written objections to the findings and recommendations with the court and serve a copy on all parties.  That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

IT IS SO ORDERED.

Dated:    April 8, 2020                                        _____
                                                                            UNITED STATES MAGISTRATE JUDGE

No. 206.